UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DANBURY BUILDINGS, INC.,              :
            Plaintiff                 :
                                      :        NO. 3:09CV01251 (DJS)
V.                                    :
                                      :
UNION CARBIDE CORPORATION,            :
            Defendant                 :

MEMORANDUM OF DECISION AND ORDER

The Plaintiff, Danbury Buildings, Inc. ("DBI") brings this diversity action against the

Defendant, Union Carbide Corporation ("UCC"), raising claims of breach of contract in

connection with a written lease agreement. Additionally, DBI seeks a declaratory judgment as to

reimbursement for costs incurred by DBI with respect to environmental reporting, investigation,

and remediation.

Now pending before the court are the Defendant's Motion for Summary Judgment and

Plaintiff's Motion for Partial Summary Judgment. For the reasons that hereafter follow, the

Defendant's motion **(doc. # 40)**  is **DENIED** and Plaintiff's motion **(doc. # 41)** is **DENIED.**


**FACTS**

This case involves whether, and to what extent, the lessee UCC should be liable for costs

relating to environmental remediation which DBI incurred subsequent to the execution of a Lease

Surrender Agreement between the parties. DBI is a Delaware Corporation having a principal

place of business in Illinois. UCC is a New York corporation having a principal place of business

in New York.

In December 1986 UCC agreed to sell property located at 39 Old Ridgebury Road, Danbury, Connecticut and 55 Old Ridgebury Road, Danbury, Connecticut ("the Demised Premises") to DBI's predecessors in interest, Nevada Investment Holdings Inc., a Nevada corporation, and Sunbelt Stores, Inc., a California corporation ("DBI's predecessors"). In connection with that sale, UCC agreed to enter into a lease with DBI's predecessors and become the lessee of the Demised Premises. On December 29, 1986, UCC entered into a written lease agreement[1] ("Lease") with DBI's predecessors concerning the Demised Premises. On May 21, 1987, DBI's predecessors conveyed the Demised Premises to DBI, which thereafter became UCC's Landlord pursuant to the terms of the Lease. UCC continuously occupied the Demised Premises until the Lease expired by its terms on December 31, 2006.

In December 1992 UCC retained environmental contractors to remove two 25,000-gallon fuel oil underground storage tanks. The storage tanks were located at UCC's administrative office building on the portion of the Demised Premises known as 39 Old Ridgebury Road. These underground storage tanks had been installed prior to the commencement of the term of the Lease. As part of the removal process, the environmental contractors retained by UCC also removed soil containing fuel oil residue that was present in and around the area where the tanks were located. Upon completion of this remediation, a report was provided to DBI by UCC on April 27, 1993. It is undisputed that from April 27, 1993, until after the expiration of the Lease term in 2006, DBI did not request, nor did UCC perform, any further environmental remediation work at the former site of the underground fuel oil storage tanks.

---

[1]The original lease was amended on June 28, 1989, and again on May 3, 1995. In their stipulation of facts, the parties use the term "Lease" to refer to the original lease as amended by both the first and second amendments. The Court uses the term "Lease" in the same manner.

In January 1992, UCC retained environmental contractors to remove three 8,000- gallon underground gasoline storage tanks from the UCC maintenance depot at the 55 Old Ridgebury Road location.  The environmental contractors retained by UCC also removed contaminated soil from the area in which the gas tanks were located. Upon completion of this remediation, a report was provided to DBI by UCC on or about April 22, 1993. It is undisputed that from April 22, 1993, until the expiration of the term of the lease, DBI did not request, for did UCC perform, any further environmental remediation work at the former site of the underground gasoline storage tanks.

 In June 2001 and again in April 2003 DBI retained an independent consultant to complete a Phase I environmental site assessment at the Demised Premises. A report was provided to DBI concerning each of these site assessments. In 2006 an environmental site assessment of the Demised Premises was completed pursuant to Article 26(b) of the Lease. A March 17, 2006 report concerning this site assessment was provided to DBI and included copies of the UCC reports from April 22, 1993, and April 27, 1993.

On December 31, 2006, DBI and UCC executed a Prime Lease Surrender Agreement ("Surrender Agreement"). The Surrender Agreement states in Section 8 that:

> (a) Except as set forth in this Agreement, Landlord agrees that
> upon the Expiration Date Tenant, its agents, employees, subsidiaries,
> affiliates, parent corporations, successors, and assigns are hereby fully
> released and discharged from any and all obligations and liabilities
> pursuant to, under, or arising from or in connection with the Premises
> and the Lease, and Landlord shall not have any claim or demand against
> Tenant by virtue of the Lease or otherwise. (b) Landlord acknowledges
> the possibility that it may have unknown claims against Tenant, and that
> by signing this Agreement Landlord expressly waives such claims, if any.
> (c) Notwithstanding the foregoing, the provisions of section 8(a) and (b)
> above shall not be construed to release Tenant from any obligations under

the Lease which accrue prior to the Expiration Date and which by their
terms survive the expiration or other termination of the Lease.

(Doc. # 37-7, at 6).

Pursuant to the Surrender Agreement the Demised Premises were returned to, and
accepted by, DBI. Section 5(c) of the Surrender Agreement provides that "[t]o the best of
Landlord's knowledge, as of the date hereof Tenant is not in violation or default of any term,
provision, or condition of the Lease, and Tenant is presently in full compliance with all terms and
conditions of the Lease . . . ." (*Id.* at 4). At the time of the expiration of the term of the Lease,
DBI had not set forth any claims for indemnification or demands for payment for any alleged
environmental contamination.

Subsequent to the expiration of the Lease, DBI entered into agreements to sell portions of
the Demised Premises to third parties. In March 2007 DBI received environmental assessments
from the buyers' environmental consultants, ATC Associates Inc., as well as from DBI's own
consultant, Haley & Aldrich, Inc. The assessments done by these consultants indicated that the
1992 remediation of the former sites of the underground storage tanks had been unsuccessful in
removing groundwater and soil contamination in accordance with applicable Connecticut
Department of Environmental Protection ("DEP")[2] standards, and that those sites, as well as
others, required further investigation and remediation. Since March 2007 DBI has incurred
expenses in investigating and remediating portions of the Demised Premises.

_____

[2]As of July 1, 2011, the Connecticut Department of Energy and Environmental Protection
became the successor agency to the Department of Environmental Protection (as well as the
Department of Public Utility Control). 2011 Conn. Pub. Acts 11-51. For ease of reference, the
Court will continue to use the designation DEP throughout this opinion.

On March 27, 2007, DBI, through its counsel, sent correspondence to UCC representatives seeking indemnification for its expenses under Article 9 of the Lease.  Article 9 in relevant part states:

> Tenant shall pay, and shall protect, defend, indemnify and hold the Indemnified Parties harmless from and against all liabilities, losses, damages, costs, expenses…claims, demands or judgments of any nature arising or alleged to arise from or in connection with the following events (unless the same shall arise out of or in connection with the wilfull misconduct of Landlord): . . . any claim or liability in respect of any adverse environmental impact or effect, whether such environmental conditions existed, developed or were created prior to or during the term of this Lease. . . .
>     * * * *
> The obligations of Tenant under this Article 9 shall  survive until the fourth (4th) anniversary of the expiration or earlier termination of this Lease.

(Doc. # 37-1, at 32-33)

UCC, responding through its counsel, rejected DBI's claim for indemnification on April 5, 2007. On September 4, 2008, DBI sent a letter to UCC demanding payment for monies expended by DBI.  On July 15, 2009, DBI's environmental consultant, Haley & Aldrich, Inc., prepared a letter that offered its opinions as to the historical perspective and current status of the outstanding environmental issues concerning the Demised Premises.  To date UCC has not reimbursed DBI for any investigation or remediation expenses incurred by DBI subsequent to the expiration of the Lease.

## STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is proper if, after the completion of discovery, the nonmoving

party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). "The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute." *American International Group, Inc. v. London American International Corp.*, 664 F.2d 348, 351 (2d Cir. 1981) (internal quotation marks omitted).

A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute as to a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party.*" Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010). The Court must view all inferences and ambiguities in a light most favorable to the nonmoving party. *See Bryant v. Maffucci*, 923 F. 2d 979, 982 (2d Cir. 1991). "Only when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Id.*

## DISCUSSION

There are two motions for summary judgment pending before the Court: UCC's Motion for Summary Judgment and DBI's Motion for  Partial Summary Judgment. The parties do not contend that there are issues of fact that need to be resolved. Rather, each party claims that, based on the facts the Court described above, it is, as a matter of law, entitled to summary judgment. DBI seeks judgment in its favor as to the breach of contract claim in Count One of its Amended Complaint and the declaratory judgment claim in Count Two of its Amended Complaint.  DBI argues that UCC failed to reimburse DBI for monies spent on environmental reporting, investigation and remediation of the Demised Premises as required by the parties' contract. DBI

also contends it is entitled to summary judgment as to each of the defendant UCC's affirmative defenses. According to DBI, if the Court were to grant all of the relief sought in its Motion for Partial Summary Judgment, the only remaining issue would be the amount of damages owed by UCC.

For its part, UCC argues that it is entitled to summary judgment as to both counts of DBI's Amended Complaint for three reasons: (1) DBI's claim seeking indemnification from UCC is not permitted by the plain language of the Lease, which applies only to third-party claims; (2) the Surrender Agreement released UCC from claims at issue in this action; and (3) DBI's claims are time-barred under the governing statute, Conn. Gen. Stat. § 52-576 (a).

**Choice of Law**

Federal jurisdiction in this case is based on diversity of citizenship between the parties pursuant to 28 U.S.C 1332.  A federal court sitting in diversity applies the law of the forum state.  *Erie Railroad Co. v. Tompkins*, 304 U.S. 64 (1938).  Both parties invoke Connecticut law to support their positions and, therefore, accept the application of the law of the forum state.  Under Connecticut law, the substantive law of the place of operative effect or performance of a contract controls.  *Whitfield v. Empire Mutual Ins. Co.*, 167 Conn. 499, 506 (1975).  The location of the Demised Premises in Connecticut means that a contract between the parties, as alleged in the Amended Complaint, would have its operative effect or performance occur in the forum state. The Court concludes that Connecticut law applies.

**Third Party Indemnification Claim**

UCC moves for summary judgment on the ground that DBI's claim seeking "indemnification" under the terms of the Lease for an intra-party dispute is not permitted as a matter of law by the plain language of the indemnification provision at issue, which applies only to third party claims. Specifically, UCC claims that Article 9 of the Lease does not apply to a dispute between the parties as it is a traditional indemnification provision to deal with third party claims and DBI has not suffered expenses as a result of a third party claim.

Article 9 of the Lease provides: "Tenant shall pay, and shall protect, defend, indemnify and hold the Indemnified Parties [i.e., the Landlord] harmless from and against all liabilities, losses, damages, costs, expenses (including attorneys fees and expenses), claims, demands or judgments of any nature arising or alleged to arise from or in connection with . . .  any claim or liability in respect of any adverse environmental impact or effect, whether such environmental conditions existed, developed or were created prior to or during the term of this Lease . . . ." (Doc. # 37-1, at 32).

UCC contends that DBI did not suffer from a third party claim, since the investigation and remediation of the property were voluntary measures taken on DBI's own initiative. UCC further contends that DBI does not allege it was ordered by the DEP to perform any environmental clean-up. It is UCC's contention that at most DBI has incurred expenses after a prospective buyer's environmental consultant offered an opinion that the Demised Premises was an "establishment" and therefore subject to investigation and remediation requirements under the Connecticut Hazardous Waste Transfer Act, Conn. Gen. Stat. § 22a-134 et seq., which regulates

the transfer of certain properties defined as hazardous waste "establishments."[3] UCC argues that the rendering of such an opinion is not analogous to the issuance of an agency enforcement order.

In opposing UCC's motion, DBI asserts that as a result of UCC's violations of the Lease and environmental law, DBI has become liable to comply with the Connecticut Hazardous Waste Transfer Act, regardless of whether the DEP has asserted a claim against DBI. In support of that assertion, DBI has offered an environmental site assessment report which indicates that the Demised Premises was identified as a Resource Conservation and Recovery Act (RCRA) small quantity generator of hazardous waste, and, for that reason, "is considered an 'Establishment,' as defined by the CT DEP." (Doc. # 37-10, at 4). DBI argues that because the Demised Premises was considered an "establishment," it was subject to the investigation and remediation requirements of the Connecticut Hazardous Waste Transfer Act, which compelled DBI as the seller to incur expenses relating to such investigation and remediation. DBI further argues that its compliance with the governing environmental regulatory scheme triggered the contractual indemnity provisions at issue without requiring a third-party lawsuit or an agency enforcement action. UCC does not dispute that its use of the Demised Premises was registered under the Resource Conservation and Recovery Act (RCRA) as a "small quantity generator" of hazardous waste but denies its hazardous waste generation rate actually qualified UCC as a small quantity generator at all times prior to the expiration of the lease.

_____

[3]The Connecticut Hazardous Waste Transfer Act defines "establishment" as "any real property at which or any business operation from which (A) on or after November 19, 1980, there was generated, except as the result of remediation of polluted soil, groundwater or sediment, more than one hundred kilograms of hazardous waste in any one month . . . ." Conn. Gen. Stat § 22a-134 (3).

Connecticut courts have explained that "[w]hen there is a sale of real property that may be environmentally contaminated, the Hazardous Waste Transfer Act . . . General Statutes § 22a-134 et seq., requires a transferor either to provide to a transferee a negative declaration to indicate that the property poses no environmental threat or to certify to the department of environmental protection that remediation measures will be undertaken." *Visconti v. Pepper Partners Limited Partnership,* 77 Conn. App. 675, 676 (2003). *Visconti* recognized that it would be possible for a seller to shift environmental remediation costs to the buyer under the Transfer Act if the parties contracted for such a cost shift. The court noted that the "contract for the sale of the property provided that the transferee would take the risk of environmental contamination and bear the cost of whatever remediation might be necessary." *Id.*

"Indemnity involves a claim for reimbursement in full from one who is claimed to be primarily liable. A party may bring an indemnification claim based on the terms of an indemnity agreement. . . . [A]llegations of contractual indemnification must be supported by the terms of the contract or the contract itself. . . .  Under Connecticut law, to state a contract-based indemnification claim, the claimant must allege either an express or implied contractual right to indemnification. . . . "  *DeCarlo & Doll, Inc. v. Town of Chester*, No. CV075003058, 2008 WL 4416073, at *2  (Conn. Super. Ct. Sept. 17, 2008) (internal quotation marks and citation omitted). Connecticut courts have explained that "[t]he logic and rationale underlying our indemnity case law are based on the premise that an action for indemnification is one in which one party seeks reimbursement from another party for losses incurred in connection with the first party's liability to a third party." *Amoco Oil Company v. Liberty Auto and Electric Co.,* 262 Conn. 142, 148 (2002).

-10-

The Court finds that on the basis of the record before it there are genuine issues of fact to be resolved as to whether the Connecticut Hazardous Waste Transfer Act applied to this matter and caused DBI to suffer third-party liability. Specifically, there remain factual determinations as to the classification of UCC as a "small quantity generator" of hazardous waste during the operative time periods of the Lease and the classification of the Demised Premises as an "establishment." A reasonable fact-finder could determine that DBI did not voluntarily undertake investigation and remediation on its own initiative, but was compelled to do so pursuant to the provisions of the Connecticut Hazardous Waste Transfer Act.

DBI contends that it is entitled to summary judgment, since the parties expressly contracted for a broad interpretation of indemnity which was intended to cover any liability or loss arising under the Lease. Specifically it claims that the sum total of the Lease provisions reflects the parties' intention that any obligation imposed on DBI is to be considered indemnification, including obligations under the Connecticut laws that  it asserts were triggered by the environmental issues in this case. UCC, however,  asserts that the parties did not contract for a broad interpretation of indemnity and references the following portion of Article 9 of the Lease in support of this position:  "Landlord shall give prompt written notice to Tenant of any and all such claims and suits. Tenant, at its sole election, may defend by counsel selected by Tenant, and approved by Landlord . . . any and all suits which may be brought, and claims which may be made against the Indemnified Parties, or in which the Indemnified Parties may be impleaded, upon any such liability, loss, damage, cost, expense, claim, demand or judgment." (Doc. # 37-1, at 33).

-11-

The Court recognizes that "[t]he intent of the parties as expressed in a contract is determined from the language used interpreted in light of the situation of the parties and the circumstances connected with the transaction," and that "any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms." *Connecticut Light & Power Co. v. Lighthouse Landings, Inc.,* 279 Conn. 90, 109, 110 (2006) (internal quotation marks omitted).  Based on the facts before it the Court concludes that the interpretation of the indemnification clause, in light of the provisions of the Lease and the Surrender Agreement, as well as the circumstances of the case, is ambiguous and therefore is a question of fact to be determined by the jury.

 **Surrender Agreement Release**

UCC contends that it is entitled to summary judgment because the Surrender Agreement executed between the parties on December 31, 2006, released it from all of the claims at issue in this lawsuit. UCC argues that Article 9 of the Lease, including the indemnification provision,  did not survive the expiration of the Lease, and does not fall within Section 8(c) of the Surrender Agreement.  Section 8(a) of the Surrender Agreement provides that "[e]xcept as set forth in this Agreement, Landlord agrees that upon the Expiration Date Tenant . . . [is] hereby fully released and discharged from any and all obligations and liabilities pursuant to, under, or arising from or in connection with the Premises and the Lease, and Landlord shall not have any claim or demand against Tenant by virtue of the Lease or otherwise." (Doc. # 37-7, at 6).  Section 8(b) provides that "Landlord acknowledges the possibility that it may have unknown claims against Tenant, and by signing this Agreement Landlord expressly waives such claims, if any." (*Id.*) Section 8(c) in turn states that "[n]otwithstanding the foregoing, the provisions of Sections 8(a) and (b) above

-12-

shall not be construed to release Tenant from any obligations under the Lease which accrue prior to the Expiration Date and which by their terms survive the expiration or other termination of the Lease." (*Id.*)

UCC argues that because DBI is claiming indemnification based on remediation commenced in 2007, this obligation did not accrue prior to the expiration date of the Lease. UCC further states that because the obligation did not accrue prior to the expiration date it was released as an "unknown claim," since at the time of the Lease expiration, DBI had not brought a claim for payment for environmental remediation.  DBI takes the position that reading Article 9 of the Lease and Section 8(c) of the Surrender Agreement as a whole, UCC remains responsible to reimburse DBI for liabilities and losses arising within the indemnity period for pollution caused by UCC before and during the term of the Lease.

Connecticut law has established that "[g]enerally, indemnity agreements fall broadly into two classes, those where the contract is to indemnify against liability and those where it is to indemnify against loss. In the first, the cause of action arises as soon as liability is incurred, but in the second it does not arise until the indemnitee has actually incurred the loss. Where an indemnity agreement, however, indemnifies against liability as well as against loss . . .  the indemnitee does not have to wait until the loss occurs, but may sue on the agreement as soon as liability is incurred." *Balboa Ins. Co. v. Zaleski*, 12 Conn. App. 529, 534-35 (1987) (citation omitted).

UCC contends that even if the remediation in question was classified as an "accrued obligation," DBI released it from any such obligation by acknowledging in the Surrender Agreement that the premises were in "good order."  Surrender Agreement Section (5)(d) states

that "[t]he Landlord acknowledges that the Premises, including but not limited to the Improvements and the Building, is as of the Expiration Date in all respects in such good order and condition as is required by the Lease upon surrender," and (5)(e) provides that "[t]he environmental study has been prepared and paid for to the reasonable satisfaction of Landlord pursuant to the provisions of Section 26(b) of the Lease . . . ." (Doc. # 37-7, at 4-5).

DBI argues that UCC expressly agreed to remain responsible for all obligations, whether known or unknown, that arose prior to expiration of the Lease and survived the end of the Lease term.  Furthermore, DBI claims that the adverse conditions at issue arose either before or during the Lease term and that the provisions in the Lease obligated UCC either to investigate and remediate those conditions or to reimburse DBI for costs incurred in undertaking UCC's obligation to do so.

UCC contends that the parties specified that the terms of the Surrender Agreement would trump any provisions in the Lease, citing the following provision in the Surrender Agreement: "In the event of a conflict between or among the terms of this Agreement and the terms of any Sublease and/or the Lease, the terms of this Agreement shall prevail and govern as between the parties hereto, unless otherwise expressly provided herein." (Doc. # 37-7, at 10). UCC submits that both parties understood they were accepting a certain amount of risk of potential unknown claims in order to achieve finality.

DBI counters by arguing that the Surrender Agreement did not change the fundamental risk allocation between the parties. While acknowledging that the terms of the Surrender Agreement would prevail in the event of a conflict between the Lease and the Surrender Agreement, DBI argues that the Surrender Agreement was not intended to supplant the Lease.

-14-

According to DBI, the current claim not only survives the term of the Lease, but was preserved by the Surrender Agreement itself.

"As a general rule, contractual indemnification claims that are based on written agreements are construed in accordance with the principles of contract law." *Lopez v. Chemical Abuse Services*, No. CV075010516S, 2008 WL 2169407, at *2 (Conn. Super. Ct. May 7, 2008) (internal quotation marks omitted) (citing *PSE Consulting, Inc. v. Frank Mercede & Sons, Inc.*, 267 Conn. 279, 290 (2004)).  Connecticut law establishes that "[i]n construing a written lease . . . three elementary principles must be [considered]: (1) The intention of the parties is controlling and must be gathered from the language of the lease in the light of the circumstances surrounding the parties at the execution of the instrument; (2) the language must be given its ordinary meaning unless a technical or special meaning is clearly intended; [and] (3) the lease must be construed as a whole and in such a manner as to give effect to every provision, if reasonably possible." *City of Bristol v. Ocean State Job Lot Stores of Connecticut, Inc.*, 284 Conn. 1, 8 (2007) (internal quotation marks omitted). DBI argues that reading the Lease and Surrender Agreement as a whole, its interpretation of accrued obligations prevails and UCC remains liable for the remediation expenses incurred by DBI.

"[A] contract is ambiguous if the intent of the parties is not clear and certain from the language of the contract itself." *United Illuminating Co. v. Wisvest-Connecticut, L.L.C.*, 259 Conn. 665, 670-71 (2002). The ambiguity must emanate from the language used by the parties. *Id*. at 671. "If the language of the contract is susceptible to more than one reasonable interpretation, the contract is ambiguous." *Cantonbury Heights Condominium Association, Inc. v. Local Land Development, LLC*, 273 Conn. 724, 735 (2005) (internal quotation marks omitted).

-15-

"When the language of a contract is ambiguous, the determination of the parties' intent is a question of fact. . . ." *Honulik v. Town of Greenwich,* 293 Conn. 698, 711 (2009) (internal quotation marks omitted).

"Summary judgment is not appropriate where a contract is ambiguous and susceptible to multiple meanings." *Travel Industry Network, Inc. v. Department of Tourism of Ministry of Tourism & Culture of Gov't of India*, No. 3:08-cv-91 (WWE), 2010 WL 1883081, at *3 (D. Conn. May 11, 2010). The Court concluded above that the proper interpretation of the indemnification clause, in light of the provisions of the Lease and the Surrender Agreement, as well as the circumstances of the case, is ambiguous and therefore a question of fact to be determined by the jury. The Court similarly concludes that as to the status of the indemnification clause in light of the provisions of the Surrender Agreement, there is ambiguity that must be determined by the jury. The interplay between the provisions of the Lease and the provisions of the Surrender Agreement is such that "the language of the contract is susceptible to more than one reasonable interpretation," *Cantonbury Heights Condominium Association, Inc.,* 273 Conn. at 735, and for that reason the agreement is ambiguous. Specifically, the jury must determine whether the remediation expenses incurred by DBI constitute "obligations under the Lease which accrue[d] prior to the Expiration Date and which by their terms survive[d] the expiration or other termination of the Lease." (Doc. # 37-7, at 6).

**Time Bar**

UCC asserts that DBI's breach of contract and declaratory judgment claims with respect to the removal of the underground storage tanks are time-barred under Conn. Gen. Stat. § 52-576 (a). In Connecticut, "[n]o action for an account, or on any simple or implied contract, or on any

contract in writing, shall be brought but within six years after the right of action accrues. . . ." Conn. Gen. Stat. § 52-576(a). UCC points out that the parties' joint stipulation of facts states that "[b]eginning in March of 2007, DBI received environmental assessments . . . which indicated that the 1992 remediation of the former sites of the underground storage tanks had not succeeded in removing groundwater and soil contamination in accordance with applicable Connecticut Department of Environmental Protection ("DEP") standards and that those sites as well as others required further investigation and remediation." (Doc. # 37, at 6, ¶ 34). Based on that stipulation, UCC contends that environmental damage at the former sites of the underground storage tanks was inflicted in 1992, or more than 17 years prior to the filing of the lawsuit and well past the applicable statute of limitations.

DBI argues that these claims are not time time-barred because, pursuant to the Lease agreement, UCC explicitly agreed to preserve its reimbursement obligations through December 31, 2010 by virtue of the provision in Article 9 (b) stating that "[t]he obligations of Tenant under this Article 9 [including claims or liability relating to adverse environmental impact or effect] shall survive until the fourth (4th) anniversary of the expiration or earlier termination of this Lease." (Doc. # 37-1, at 33).

In addition to arguing that the parties did not "contract around" the statute of limitations vis-a-vis Article 9 of the Lease, UCC further contends that if DBI is claiming that it had not incurred any liability or loss until 2007 when the Transfer Act was triggered, these claims were explicitly released by the Surrender Agreement, as Section 8(c) preserved only a narrow class of obligations that accrued prior to the Expiration Date of the Lease in 2006. DBI counters that its obligation accrued prior to the Lease expiration.

The Court finds that the timeliness issue raised by UCC implicates the same ambiguities arising out of the interplay between the Lease and the Surrender Agreement that were previously discussed in connection with the third party indemnification and Surrender Agreement release claims. For the same reasons expressed with regard to those claims, the Court concludes that these ambiguities cannot be resolved on the basis of a motion for summary judgment, but must be determined by the jury.

## **CONCLUSION**

For the foregoing reasons, the defendant's Motion for Summary Judgment (**dkt. # 40**) is **DENIED** and the Plaintiff's Motion for Partial Summary Judgment (**dkt # 41**) is **DENIED**.

**SO ORDERED** this     15th      day of July, 2013.

___/s/ DJS_____
           DOMINIC   J.   SQUATRITO
           UNITED STATES DISTRICT JUDGE